## EASTMAN v. AMOSKEAG MANUFACTURING COMPANY.

44  143
66  158

Where testimony is admitted on trial, which is incompetent as the case then stands, but which is afterward made competent by the introduction of other evidence, the verdict will not be set aside, even though such testimony was admitted upon erroneous grounds, and without any anticipation of its afterward being made competent by other evidence.

The admission of an independent fact, made during negotiations for a compromise of a controversy, is competent evidence against the party making such admission; and the fact thus admitted need not be independent of the subject matter of the controversy. All that is required is, that it be a distinct admission of a fact, as distinguished from an offer to buy peace, or compromise a controversy.

Slight secondary evidence of the contents of a paper is sufficient against the party who might remove all doubts by producing the original, but refuses to do so, after proper notice.

The presiding justice at a trial term may, in the exercise of his discretion, if a proper case be made, suspend any of the rules of court, in a given case, and his action will not ordinarily be subject to revision at the law term.

In questions relating to heights and distances, and to the number, quality and dimensions of objects, a witness who has not absolute knowledge on the subject, by measuring, counting, &c., may not be able to testify without an implied expression of opinion; but that is no objection to the testimony upon such questions and subjects.

A party erecting a mill-dam on his own land, which causes the water to overflow the land of another, is not exonerated, by conveying the land and dam to a third person, from responsibility for damages arising from such flowage, after such conveyance.

No notice or request to abate the nuisance is necessary before bringing suit against the original wrong-doer in such case for the damages done, but the grantee of the nuisance is not liable to the party injured, until, upon request made, he refuses to remove the nuisance.

But, when the land injured by the nuisance has been conveyed since the erection of the nuisance, the purchaser stands in the same position as the vendor. He may sue the original wrong-doer — the person who erected and still maintains the nuisance — without notice or request to abate, for the damage done to the land while he owned and occupied it. Nor does it matter how many times the land injured may have changed hands since the erection of the nuisance.

Certain instructions were given, and others asked and refused, all based upon the assumption that no actual damage had been done the plaintiffs in flowing their land, and that they were entitled to nominal damages only. The jury returned a verdict for the plaintiffs for $200; — *Held,* that upon this finding all these instructions became immaterial.

An act of the legislature, authorizing a corporation to build a dam on their own land, upon and across a river which is a highway, merely protects the corporation from an indictment for a nuisance in obstructing the river; but if, in building their dam, they overflow the land of others, such act of the legislature does not protect them against liability for such flowage.

CASE, for flowing the plaintiffs' land on the Merrimack river, between July 3, 1856, and October 21, 1859, by means of the defendants' dam and flash-boards, at Amoskeag falls, across said river, below said land, and thereby washing away the soil. The declaration alleged the plaintiffs' seizin in the right of the wife. Failing at first to prove their deed, the plaintiffs began by introducing evidence tending to show possession of the premises, described in the declaration, in said Arthur, from the summer of 1856. The defendants' dam and flash-boards had for some time prior to this been kept at the height at which they were kept during the time complained of. The plaintiffs then offered evidence tending to show the condition of the stream for several years prior to the commencement of the possession shown, and extending back to a time when the witness testified the dam did not extend entirely across the river; to which the defendants objected, on the ground that it was prior to the plaintiffs' possession, but the court admitted the evidence. The defendants cross-examined a witness as to the existance of a dam at said falls for twenty years or more prior to 1856. One Farmer, owning land on the river, opposite the plaintiffs', testified to a settlement with the company in August, 1855, in the course of which he stated that the defendants' agent admitted they flowed his land. Upon cross-examination, it appeared that the settlement resulted in the purchase of a right to raise the defendants' stone dam two feet higher, and was reduced to writing. Upon the defendants' motion, the court ruled out so much of Farmer's evidence as stated the contract, but ruled that the evidence of the admission of the particular fact was competent.

One Shirley, owning land on the river, some five miles above the plaintiffs', testified that in 1858 the defendants' agent was on his land, and he pointed out to the agent how high the water came up on his land in high water, and in freshets, and how it damaged his

land; and that subsequently the agent paid him "for something done by water" in 1858, and he gave the defendants a receipt. Notice to the defendants to produce the receipt having been shown, the witness said he had a copy of the receipt, and produced it. On being examined by the defendants' counsel, he said the copy was not made by him or (from the original) in his presence, or compared by him with the original, but that he was able to state as to its correctness, "for he looked pretty sharp at the receipt when he gave it." The defendants objected to the copy as not sufficiently proved, but the court admitted it. It was as follows:

"Received of the Amoskeag Manufacturing Company $100 in full for claim of damage by flowage, done previous to the date of this receipt, over the farm in Hooksett owned and cultivated by me,—in consequence of flash-boards kept on said company's dam in Manchester.                                        JOHN SHIRLEY."

"Manchester, May 1, 1858."

One Partridge, owning land on said river, above the dam, testified that about 1854 he told the defendants' agent, Straw, that their flash-boards were a damage to him, and he should want pay for it; that Straw replied that they were willing to pay all damage; that they did not claim any right to have the flash-boards on; that Straw then settled with and paid him. The defendants subsequently introduced evidence tending to show that the settlements with these two witnesses were compromises; and in regard to this, the court charged the jury that if they found these settlements to be compromises, they were not to be considered as evidence against the defendants; but if they found any independent admission of a fact made, during such compromise, by the defendants' agent, such admission would be evidence against the defendants. The plaintiffs called two counsellors of this court, not apparently engaged in the active conduct of the cause before the jury, who were the subscribing witnesses to the deed under which the plaintiffs claimed. They had for several terms been retained, and were counsel for the defendants, and their names appeared as such on the printed docket, and they had not been summoned before the commencement of the term. For this reason they declined to testify. The plaintiffs then moved the court to suspend the 36th rule of court in its application to the case of these counsellors. The court, deeming such a suspension within their discretion, and deeming the case, upon the facts appearing and the evidence offered by the plaintiffs, a proper one for the exercise of such discretion, ordered that unless the defendants would admit the formal execution of the deed, the rule should be so suspended, upon condition that the plaintiffs should call said counsellors only to the formal execution of the deed, and should waive the application of the 35th rule of court to them. To this the plaintiffs consented, and the defendants declining to admit the formal execution of the deed, the court compelled the counsellors to testify. The deed which conveyed the premises to the female plaintiff in the usual form, and bore date July 3, 1856, was then put in.

By cross-examination of one of the plaintiffs' witnesses, the de-

fendants proposed to show that the effect of the Lowell dam, situated some thirty miles below the dam in question, had been to diminish the washing of the banks, by showing the comparative washing on the banks between Cromwell's falls and Taylor's bridge where the water was affected by the Lowell dam, and on the banks for seven miles above Cromwell's falls where it was not affected by the dam, and by showing that the banks and the river in these places were similar to the banks and the river at the plaintiffs' land. Taylor's bridge is eighteen miles, and Cromwell's falls are thirteen miles, below Amoskeag falls. The plaintiffs objected to this evidence, and the court rejected it, but such evidence from other witnesses was subsequently put in by the defendants without objection.

There was evidence tending to show that the plaintiffs' dam affected and raised the water to Hooksett falls. Witnesses owning land on the river between the defendants' dam and Hooksett falls testified that the water had been higher between these places the last five years than before. And in this connection, subject to the defendants' exception, they were permitted to state and describe the changes in the banks on their lands and on the plaintiffs' land from washing during the last five years, and during the previous years, stating the comparative extent. The plaintiffs introduced evidence tending to show that in the summer of 1856, the defendants' built up a wall constituting part of their dam on a ledge situated in the dam. The evidence tended to show that before this the water did not run over the ledge except in high water, and one of the plaintiffs' witnesses, who described the structure, testified, on cross-examination, that this part of the dam was outside the original channel of the river. The defendants then requested the court to rule out the testimony of this witness, relating to this structure, "on the ground that the structure was outside of the original channel," but the court declined to do so. At the time of the grievances complained of, the defendants' flash-boards extended two feet above the stone dam. E. A. Straw, the defendants' agent, testified that he had made for the defendants various arrangements with riparian proprietors above as to water rights, and that these arrangements were all in writing. The defendants afterward proposed to ask him to "state from what persons in possession of land on the Merrimack river, between Amoskeag falls and Hooksett falls, the defendants have not acquired the right to raise their stone dam permanently two feet above the top of their present stone dam." To this question the plaintiffs objected, as immaterial, and as calling for the opinion of the witness, and because the writings should be produced to show what rights had been acquired; and the court declined to allow the question to be put.

The defendants claimed a right to flow the plaintiffs' land, as they had done during the time complained of, by adverse user. As to this, among other things, the court instructed the jury that if at any time during the period complained of, the defendants, by their dam and flash-boards, raised the water on the plaintiffs' land, not merely theoretically, but actually and perceptibly, higher than they had shown the right to raise it at such time by twenty years' adverse

user, they were liable in nominal damages, although no actual damage was shown; and that in such case no notice from the plaintiffs to the defendants was necessary, although this flowage was the same as it was at and prior to the date of the deed under which the plaintiffs claimed.

The defendants introduced certain acts of the legislature, passed July 1, 1831, June 29, 1841, July 3, 1861, June 26, 1838, June 26, 1815, and December 24, 1798 (to be referred to as a part of the case), duly accepted, and under which the defendants made title to certain lands on the river upon both sides about Amoskeag falls; and the defendants claimed the right, under these acts, to flow as they had done; but the court instructed the jury that these acts did not, as against the plaintiffs, give the defendants the right to raise the water on the plaintiffs' land actually and perceptibly above the natural flow of the stream.

The defendants requested the court to instruct the jury that although they actually and perceptibly raised the water on the plaintiffs' land in the channel of the stream, if they so raised it merely within the banks of the river, and did no actual damage, they were not liable, if, under all the circumstances, the jury found they only made a reasonable use of the stream; but the court declined so to do.

The jury having returned a verdict for the plaintiffs, the defendants moved that the same be set aside and a new trial granted, because of the foregoing rulings and instructions of the court; and the questions of law were reserved.

*S. N. Bell* (with whom were *H. Foster*, *W. C. & S. G. Clarke*, and *Morrison & Stanley*), for the defendants.

I. The evidence offered, to show the condition of the stream before the plaintiffs' possession commenced, was, as the case stood, and as it must have stood under proper rulings of the court, incompetent. The plaintiffs' title, as it appeared by the evidence offered, was that derived from possession, and possession merely. Such possession could extend only to the premises actually occupied by the plaintiffs, and in the situation in which they were at the time when the possession commenced, and subject to all existing rights and easements. *Riley* v. *Jameson*, 3 N. H. 23; *Moor* v. *Campbell*, 15 N. H. 208; *Hoag* v. *Wallace*, 28 N. H. 547. The plaintiffs' holding possession without title, can not complain of the possession held by others, nor of their occupation, unless such occupation commenced after the date of the plaintiffs' possession. The possession of the defendants', by their dam and the flowage by means of it, is as good a title as the occupation by the plaintiffs, and each thereby acquires title to the extent to which his occupation extends. The presumption of law is in favor of the true title, and when the plaintiffs show no title but naked possession, the prior possession of the defendants is the better title. *Lund* v. *Parker*, 3 N. H. 49. The dam and flash-boards remained the same after the plaintiffs' possession as they had been before, and that places the earlier possession

in the defendants, and makes their title the true title. The defendants being in the actual occupation, the plaintiffs were presumed to know the situation and extent of their interest at the time when his possession commenced. *Haddock* v. *Wilmarth,* 5 N. H. 181. The occupation by the defendants did not divest the plaintiffs' title by the prior possession. *Little* v. *Downing,* 37 N. H. 355. The decisions in relation to possession being evidence of title in fee, go no farther than to hold that "possession under a claim of title is *primâ facie* evidence of title in fee;" *Bassett* v. *Salisbury Manufacturing Company,* 28 N. H. 438 ; but mere possession is not evidence of such title.

II. The counsel for the defendants should not have been compelled to testify in the cause against the will of the defendants, or their own. The statute (ch. 1659, sec. 14, Pamphlet Laws, 1855) provides, that "the justices of the Supreme Judicial Court shall make, from time to time, all necessary rules and orders for conducting the business of the Supreme Judicial Court." The rules, when established, have the force of law, and are binding on all persons, until duly amended or abolished by some action of the justices of the court. The statute here gives the justices of the court the power to make the rules, and not to a single justice. If the justices in their collective capacity had taken no action, the judge holding the term of the court might make special rules for conducting the trial of each case, or for the term ; but when the subject has been acted upon by a general rule by the whole court, without limitation, or authority to a single judge to modify or suspend the rule, it is beyond the power of a single justice to suspend its operations. In most of the rules there is contained an authority to modify or suspend them, but not as to this rule. The general rule of law is well established, that when authority is given to three or more, it must be exercised by a majority, and that particularly where the act to be done is in its nature judicial, and requiring the exercise of judgment and discretion. *Keay* v. *Palmer,* 5 N. H. 53 ; *Jewett* v. *Alton,* 7 N. H. 253 ; *Petition of Nashua,* 12 N. H. 425 ; *Petition of Farwell,* 2 N. H. 124 ; *Ex parte Rogers,* 7 Cowen 526 ; *Glidden* v. *Towle,* 31 N. H. 147 ; *Andover* v. *Grafton,* 7 N. H. 304 ; Story on Agency 44 ; *Rex* v. *Whittaker,* 9 B. & C. 648 ; *Grindley* v. *Baker,* 1 B & P. 229 ; *Baltimore Turnpike,* 5 Binn. 481 ; Co. Litt. 181, b ; *Dispatch Line, &c.,* v. *Bellamy Manufacturing Company,* 12 N. H. 226 ; Rev. Stat., ch. 1, sec. 13 ; *Palmer* v. *Conway,* 22 N. H. 144. The plaintiffs were well aware of the existence of the rule, and of the fact that the witnesses to the deed were and for a long time had been counsel in the suit ; and the omission to summon them before court was equivalent to and in effect was a notice to the defendants that the plaintiffs did not intend to rely on proof of the execution of the deed as a part of the evidence in the case ; and the defendants had a right to act on that view, and did so act in the preparation of their defense. It was in effect a waiver of the right to use the testimony of the witnesses, and should be governed by the rules applicable to cases of waiver. *King* v. *Hutchins,* 26 N. H. 139 ; *State* v. *Richmond,* 26 N. H. 243 ; Bell's Digest on Waiver ; *Warren* v. *Glynn,* 37 N. H. 340.

III. The admission made by either party during an attempt to compromise must be of independent facts, and such as are not the subject of the compromise itself, and such as, aside from being made in connection with the offer to compromise, are of themselves competent evidence. The receipt of Shirley shows that it was distinctly a compromise of the claim. There was no admission of any thing affecting the rights of the parties. All that appears is, that he made the claim, and that the claim was paid.

IV. The evidence of Farmer, Partridge and Shirley, of admissions made by them, was in itself incompetent. The transactions were between other parties, not the same as in this suit, and the admissions went only to affect the rights of the witness so far as their interests were concerned. They did not relate to the premises of the plaintiffs, nor to his rights. What they might have said or done, as to the lands of others, was of no consequence as affecting the plaintiffs' rights. The fact that the defendants had not the right or did not claim the right to flow the land of Partridge or Farmer, had no legitimate tendency to show that they did not claim or did not possess entirely different rights with reference to the plaintiffs.

V. The copy of the receipt of Shirley was not competent, because the witness should have testified from memory. The paper was offered as a copy, and it should have appeared to have been made or examined by him. *Jones v. Fales*, 5 Mass. 101; 4 Phill. Ev. 450. A copy of a copy is not evidence. *Whiteacre v. McIlhany*, 4 Mumf. 310; *Ryves v. Braddell*, 1 Irish T. R. 184; *United States v. Sherman*, 1 Pet. C. C. 98; *Norwood v. Greer*, 5 Mart. Louis. (N. S.) 175; 4 Phill. Ev. 250, 287; *Everingham v. Randall*, 2 M. & R. 138. Nor can the witness rely on the memorandum made by another, unless he is able to testify to its truth as well as to identity. *Jones v. Stroud*, 2 C. & P. 196; *Withers v. Atkinson*, 1 Watts 236. It was, in effect, asking the witness whether he gave a receipt in the following terms, and his answering that he did, which would be incompetent. 1 Phill. Ev. 422–428. The witness might have stated from recollection the contents of the paper, but if the copy is to be used as evidence, and to be submitted to the jury (as this paper was), it should have been proved to be a copy. *Kerns v. Swope*, 2 Watts 75–80; 4 Phill. Ev. 457; 2 Phill. Ev. 239.

VI. It was competent to show the effect of the same stream, whether above or below the defendants' dam, where the relative situation of the premises and the character of the stream, the situation and character of the soil, were similar and affected by a similar dam, as affording a means of determining the effect of a like obstruction near the plaintiffs' land, and as tending to show the probability whether the injuries complained of were caused by the acts of the defendants, or were the operations of natural causes. The same principle applies as in determining the value of real estate. *Whipple v. Foster*, 10 N. H. 130; *Hoitt v. Moulton*, 21 N. H. 586.

VII. The evidence as to whether the water was higher for the last five years was objectionable, as it called for the opinion of the witness as to the comparative effect of the action of the stream at different periods, instead of stating the existing state of the stream

and banks; the condition at the commencement of the five years, and the condition at such earlier period as it was desired to call to the attention of the jury, so that they might draw the inference and make the comparison. The evidence and the inquiries made, required the witnesses to state their opinion on a matter of fact, of which the jury were to judge, and on which they were to form their own judgment from the facts stated and not from the opinions of the witnesses. *Elliot* v. *Heath*, 4 N. H. 131; *Hoitt* v. *Moulton*, 21 N. H. 586; *Patterson* v. *Colebrook*, 29 N. H. 121. It was also objectionable, as it included the time both before and since the date of the plaintiffs' writ, in the comparison.

VIII. The question as to the person from whom the defendants had not acquired the right to raise the stone dam two feet, was competent. It did not call for any opinion as to the effect of the writings given. It was competent to rebut the possession of the plaintiffs, or to show that the acts of the defendants were done under claim of right, or color of title (*Edmunds* v. *Griffin*, 41 N. H. 529), and as tending to lessen the damages, and to show that this was not a case (as the plaintiffs claimed and as they had introduced a large amount of evidence to show) where exemplary damages should be allowed.

IX. Evidence was introduced in reference to a part of the dam on the ledge, built in 1856, and which was outside of the natural channel of the stream. This evidence should have been rejected, as it formed, as the evidence stood, no part of the obstruction to the water, and could have had no effect on the natural flow of the stream.

X. The evidence of the washing and flowing of the bank, before notice to remove the obstruction, was improperly admitted. The dam and other obstructions were in the same place, the same height, and used in the same manner as when the plaintiffs' possession commenced, and the same as when his title was acquired. The defendants were not liable for any damage done, if their dam, &c., were there without right, until after notice to remove them. What the effect of the washing was, before the notice was given, if any, to remove the obstruction, was entirely incompetent. It was not a matter proper to be considered by the jury in estimating the amount of damages. When the dam, &c., were the same, obstructing the water before the time of the injury complained of, as they did afterward, notice to remove the obstructions was necessary, to entitle the plaintiffs to maintain their action. Without notice to remove the obstruction the plaintiffs had no occasion to complain if the water was not raised higher than when they acquired title. If the water were raised higher than before, within twenty years, but not since the plaintiffs' title commenced, the defendants were entitled to notice to remove the obstructions. *Carlton* v. *Reddington*, 21 N. H. 291; *Snow* v. *Cowles*, 22 N. H. 296; *Woodman* v. *Tufts*, 9 N. H. 88; *Penruddock's Case*, 5 Coke 100; Ang. on Water-courses, sec. 413; *Loftin* v. *McLencore*, 1 Stew. 123; 1 Morg. Vad. Mec. 181, 297; Com. Dig., Action on the Case for Nuisance.

XI. Nor was the plaintiff injured by a rise of the water unless accompanied by some actual and appreciable injury. It would be

*damnum absque injuriâ*, for which the action would not lie.   *Weston* v. *Alden*, 8 Mass. 136.

XII. The legislature had the right and power to authorize the use of the stream, and it gave the defendants the right to raise the water, so far as their dam would raise it, provided the use was a reasonable one.   Their right was not limited by any threatened or even actual rise of the water, unless accompanied by actual damage.   If this was not the grant made by the legislature, it is difficult to conceive what terms would give the right the defendants claim under their charter.

XIII. The right of the plaintiffs to the land on the stream is not an absolute right, but is subject to the conditions incident to streams, and the rights of the public and other individuals on the same stream, both above and below.   To hold that one proprietor on a stream has an absolute right to have the stream flow as it has always flowed, in its strict sense, is simply to say that he has the right to prevent any one else from using the stream at all; for it is manifest that every interference with the stream, either above or below, causes some change in the natural flow.   That change may be accompanied by injury to other owners, or it may not.   The water may be raised perceptibly higher than it was before, and still no actual damage be done.   The test is not whether the water is raised or lowered, or its current diminished or increased; these are the inevitable and incidental consequences of any change, however slight.   The true test is, does the use made by one proprietor, in the manner and under the circumstances under which it is used, cause any actual, sensible or appreciable damage.   The rule is, that the proprietor of land through which a stream flows has a right to have it flow in its natural course, subject to this qualification: that each proprietor may use and apply it to domestic, agricultural or manufacturing purposes, provided he uses it in a reaaonable manner, and so as to work no actual or material injury to others.   *Gerrish* v. *Newmarket Manufacturing Company*, 30 N. H. 478;   *Tillotson* v. *Smith*, 32 N. H. 90;  Angell on Wat., sec. 117, &c.   And an action does not lie for such reasonable use of a right, though it be to the annoyance of another.   1 Com. Dig. 305; Kaimes Equity, 46, b, 1;  *Thompson* v. *Crocker*, 9 Pick. 59;  *Cooper* v. *Hall*, 5 Ham. 320;  *Weston* v. *Alden*, 8 Mass. 136; *Merritt* v. *Brinkerhoff*, 17 Johns. 306;  *Alder* v. *Saville*, 5 Taunt. 454.   The question, what is a reasonable use, is a question of fact, to be determined by the particular circumstances of each case;  not a matter of law, to be determined by any abstract rules. It is to be submitted to the jury as other like questions of use, reasonable care, reasonable prudence, reasonable diligence, and to be governed by substantially the same general rules as govern the decision of analogous cases.   *Merritt* v. *Brinkerhoff*, 17 Johns. 306, &c.

*H. F. French*, with whom were *Cross & Topliff*, and *Tappan*, for the plaintiffs.

I. " The condition of the stream prior to the plaintiffs' title is competent evidence to show by comparison the changes made by

the defendants' dam. Possession is a good title against a wrong-doer, a party without title;" 28 N. H. 453; and being evidence of title to land extending *ad filum aquæ*, the plaintiffs have *primâ facie*, the right to the natural flow, and may show how that was. An easement, such as flowage, " constitutes neither adverse entry, nor possession, nor even claim, and could in no sense constitute a dis-seizin." *Shaw*, C. J., 17 Pick. 75; *Bassett* v. *Salisbury Co.*, 28 N. H. 438. And, again, the plaintiffs' title by deed superseded and de-fined his title by possession. If the evidence was merely immaterial, as the defendants' brief alleges, it is no cause for a new trial. *Page* v. *Parker*, 40 N. H. 48; 28 N. H. 457.

II. Farmer's testimony. The ruling "that evidence of the ad-mission of the particular fact is competent," is the established rule of law. *Sanborn* v. *Neilson*, 4 N. H. 501; *Downer* v. *Button*, 26 N. H. 338.

III. Shirley's receipt. The proposition was to show by a written paper, an admission of the defendants' agent. The defendants hav-ing possession of the paper, and not producing it, its contents might be proved. (1) If the question was for the jury, whether this was a copy or not, there was certainly competent evidence to prove it, the witness swearing expressly that it was. Neither comparison or actual writing by the witness is essential to his knowledge that it is a true copy. A machine copy taken by a witness is competent. 1 Greenl. Ev., sec. 559, note; cites *Simpson* v. *Thoreton*, 2 McLean & Rob. 433. Very slight evidence is sufficient where the other party withholds a paper. *Foye* v. *Laighton*, 24 N. H. 41, and cases collected. (2) It seems, however, that the court should decide this question, and if so, the decision of the presiding judge, that the paper was a copy, is final. *Bell*, J., 28 N. H. 453; *Page* v. *Page*, 15 Pick. 375. (3) As a memorandum of the contents of the paper, signed by him, it was competent, even though he had now forgotten the language, the witness testifying that he knew it to be accurate. *Haven* v. *Wendell*, 11 N. H. 112; *Seavy* v. *Dearborn*, 19 N. H. 351, 357; *Pembroke* v. *Allenstown*, 41 N. H. 369. (4) It being clearly competent for the witness to state from memory the contents of the paper, its going to the jury could not affect the verdict. *Bell*, J., 28 N. H. 457; *Kent* v. *Tyson*, 20 N. H. 127.

IV. Partridge's testimony stands the same as Farmer's testi-mony.

V. Suspension of the 36th Rule. We understand this point to have been expressly decided in *Deming* v. *Foster*, 42 N. H. 165, where the 21st rule was suspended.

VI. Effect of Lowell dam at particular and remote localities. (1) The evidence was properly excluded, in the discretion of the court, as too remote. (2) It was evidence of particular facts to prove a general proposition in science. If evidence of the general effect of dams on rivers were competent, it must come from ex-perts. Otherwise, an issue of fact would arise on every statement.

VII. Height of water between the dam and Hooksett. The essential point in the plaintiffs' case being that the water was raised on their land, and it appearing that the dam flowed to Hooksett,

the fact that it was higher at other points tended to show it higher on the plaintiffs' land between. The description of "changes in the banks," from washing, "in this connection," was mere fact, obvious to any eye, and not properly opinion. *Hall* v. *Davis*, 36 N. H. 569; and see *Willis* v. *Quimby*, 31 N. H. 485.

VIII. That part of the defendants' dam was outside of the original channel, seems to us a singular reason for excluding evidence of its existence. It is enough for us that the case finds this structure to be a "part of their dam on a ledge situated in the dam."

IX. The testimony of Straw as to what proprietors the defendants had not acquired easements of, was properly excluded, on three grounds: (1) It was immaterial. (2) It involved the opinion of the witness how such rights could be acquired. (3) The only competent evidence of such rights must be in writing.

X. As to notice before suit. We understand this point was settled in Rockingham county, in a case not yet reported.

XI. Effect of the acts of the legislature. See Angell on Watercourses, sec. 476; *Thatcher* v. *Dartmouth Bridge*, 18 Pick. 50; *Crittenden* v. *Wilson*, 5 Cow. 165; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162. The act of 1861 expressly excepts pending suits from its operation.

XII. The refusal to charge that the plaintiffs could not recover except for actual damage, was right. The plaintiffs may recover, if only to prevent the defendants' gaining an easement. *Bassett* v. *Salisbury Co.*, 28 N. H. 439. Again, the refusal was immaterial, the verdict finding substantial damage.

SARGENT, J. It becomes immaterial to consider whether the evidence concerning the state and condition of the stream before the plaintiffs' possession commenced, would have been competent, had no other title but possession been introduced; because it was afterward made competent by the introduction of the plaintiffs' deed, which showed not only the extent of the possession but of the right. And were we satisfied that this evidence was incompetent at the time it was introduced, and as the case then stood, concerning which we express no opinion, yet, where the plaintiffs, by the next piece of evidence — their deed — make the evidence objected to clearly competent, we should not set aside the verdict; first, because the court may have admitted the evidence, with the expectation that it would in that way be rendered competent by the subsequent evidence; and, second, because, however that may have been, we can see clearly that the defendants have not been injured by the ruling.

The objection to the testimony of Farmer is not well founded. Whatever was done or said between him and the company, by way of compromising any controversy between them, was incompetent; but the fact which he says the defendants' agent admitted to him, namely, that the defendants flowed his land, we think was competent. His land was on the opposite side of the river from the plaintiffs' land, and from its location, and the other evidence which we may presume was before the jury in relation to its situation and elevation, as compared with the plaintiffs' land, we think the fact, if

established, that the defendants flowed Farmer's land, would be competent, upon the question whether they flowed the plaintiffs' land, which was a material point in the issue.

As to the testimony of Shirley about his settlement and his receipt, and the testimony of Partridge concerning his settlement, the instructions of the court were also correct. It is not necessary that the fact admitted should be independent of the subject matter embraced in the compromise; but it must be an admission of a fact, relevant to the present issue, as distinguished from an offer to buy peace, or compromise a controversy; Sanborn v. Neilson, 4 N. H. 501; Downer v. Button, 26 N. H. 333; and that it was proper to submit the whole transactions and conversations to the jury, with such instructions as were here given, is settled in Bartlett v. Hoyt, 33 N. H. 151.

The copy of the receipt was properly admitted. There is no doubt that the witness, in a case like this, where secondary evidence was admissible, might have stated the contents of the receipt from recollection, had he been able to do so, if he had had no copy. He swears that the paper produced is a copy; and though, on cross-examination, he says he did not make it himself, nor was it made from the original in his presence, or compared by him with the original, he still asserts that it is a true copy, and gives the reason why he is able thus to state. The witness was not asked if he recollected the contents of the receipt, and could state them; but he was asked whether a certain paper presented to him was a copy of the receipt, and if he could swear, as he did, that it was a copy, both on direct and cross-examination, we think sufficient primâ facie to make the copy admissible, in a case like this, where the defendants had the original in their possession, and refused to produce it on notice. In such a case slight evidence of the contents of the paper is sufficient against the party who might remove all doubts by producing the original. Foye v. Leighton, 24 N. H. 41, and cases cited. The witness testified that he knew it was a copy, which made it competent evidence to go to the jury; and the defendants had it in their power to show whether the witness was mistaken or not, and did not choose to do so. They can not complain. Bassett v. Salisbury Co., 28 N. H. 452.

The suspension of the 36th rule of court was a matter within the discretion of the court. Deming v. Foster, 42 N. H. 165, 178. We see no reason for revising the ruling of the court in the present case (if we would do it in any case), when we consider the circumstances, and the conditions upon which the ruling was made.

We think the evidence in relation to the Lowell dam, thirty miles below the dam and land in controversy, and its effects on the stream and river banks in its neighborhood, was properly excluded, notwithstanding evidence of the same facts was afterward admitted without objection. It would only be raising a collateral issue, and would be undertaking to test the point in dispute by another equally doubtful, where all the facts alleged, if proved, would furnish no legal presumption as to the principal facts in dispute. It would, in truth, be raising a new issue, to be tried and decided,

which the plaintiffs could not be expected, and would not be required to be prepared to meet on this trial. *Collins* v. *Dorchester*, 6 Cush. 396; *Aldrich* v. *Pelham*, 1 Gray 510; *Hubbard* v. *Concord*, 35 N. H. 59.

The evidence tended to show that the defendants' dam raised the water in the river as far back as Hooksett falls, and the defendants were claiming that they had acquired a right by prescription to raise and use the water, as they had raised and used it since the plaintiffs purchased their land. Now, in answer to that claim, the plaintiffs introduced witnesses owning land between the dam and Hooksett falls, on the river, who were allowed to testify that the water had been higher for the five years past than at any time before; and in connection with that fact they were allowed to describe the changes in the banks on their lands, and on the plaintiffs' land, from washing, during the last five years, and also for the years previous, and stated the comparative extent of these changes, in the different periods of time.

We do not consider this testimony objectionable, as calling for the opinion of the witnesses. They stated facts within their knowledge, occurring in different periods of time; and they could well state whether the water had been higher or lower, or the banks had been washed more or less in one period than in the other, and about how much, more or less, as matters of fact, about which a witness may properly testify. In questions relating to heights and distances, and as to the number, quantity and dimensions of things, a witness may not be able to testify without an implied expression of opinion; but that is no objection to the testimony upon such points and subjects. *Hackett* v. *Railroad*, 35 N. H. 390; *Willis* v. *Quimby*, 31 N. H. 485; *Hall* v. *Davis*, 36 N. H. 569. And if the water had been higher on all their lands, and on the plaintiffs' land, and the banks had been washed more, on all these lands, for the last five years, than before, and the evidence tended to show that this rise of water and washing of the banks was caused by the defendants' dam and flash-boards, we are at a loss to see why this evidence was not competent to rebut the evidence of a prescriptive right thus to flow; which right requires twenty years' user as a foundation on which to rest. This testimony was not introduced upon the question of damages, but upon the question of right. The plaintiffs could only recover damages for injuries done after they owned the land.

There is no foundation for the exception to the testimony in relation to the building of a part of the dam in 1856, on the ground that "this structure was outside the original channel." That could make no difference; for if the defendants built and maintained a dam any where, which raised and kept the water on the plaintiff's land higher than they had the right to do, it could make no difference whether it was in the original channel or out of it. The case finds that it was a part of the defendants' dam, and was erected where the water did run over in high water, and thus impeded and raised the water at a time when damages are usually done to land by flowage.

The question to Straw was properly excluded. When its particular form is examined it will be seen that in order to answer it, Straw must decide upon the legal effect of all the written contracts he had taken from such riparian proprietors, in order to decide from how many he had, and from how many he had not obtained such right; a responsibility which the law does not impose upon any witness, and which it will allow to be assumed by none. But even if the question had been so varied as not to be liable to that objection, it is difficult to see how it could be material. If he had obtained such rights, or deeds, or writings, purporting to convey them from all such proprietors except the plaintiffs, that would in no way affect the plaintiffs' rights, or the defendants' liability for infringing them. If he had named several persons from whom he had not obtained such rights, and had not mentioned the plaintiffs among them, that fact would not have been competent to show that he had acquired any such right from the plaintiffs, because, from his own testimony, it appears that if he has any such grant it is in writing, and must be produced, as the best evidence of the fact. We do not see that the question could have been answered in any way which would have made the answer material.

Nor was it necessary that the plaintiffs should notify the defendants before they brought their suit. The doctrine of the cases in this State and elsewhere is, that he who erects a nuisance does not, by conveying the land to another, transfer the liability for the erection to the grantee; and the grantee is not liable until, upon request, he refuses to remove the nuisance, for the reason that he can not know, until such request, but the dam was rightfully erected; and there can be no injury in holding to this doctrine, as the original wrong-doer continues liable, notwithstanding his alienation. *Plummer* v. *Harper*, 3 N. H. 88; *Woodman* v. *Tufts*, 9 N. H. 91; *Curtice* v. *Thompson*, 19 N. H. 471; *Carleton* v. *Redington*, 21 N. H. 291; *Snow* v. *Cowles*, 22 N. H. 296; *Waggoner* v. *Jermain*, 3 Denio 306; *Johnson* v. *Lewis*, 13 Conn. 303; 1 Ch. Pl. 83.

In the case before us the party erecting the dam and causing the nuisance, if there is any, still continues to maintain it. There has been no transfer of the dam, or the land on which it stands, nor any change of possession since the dam was built. But the land claimed to be damaged by the flowage had changed hands, and the instructions of the court were, that, upon certain conditions, the plaintiffs would be entitled to recover nominal damages, &c.; and in such a case no notice from the plaintiffs was necessary, although this flowage was the same before as since the plaintiffs' deed.

By this ruling it may have been intended to be held that no notice, in the particular case stated, was necessary; that is, where only nominal damages were to be recovered; or it may have been intended to be held that no notice in any case was necessary where the nuisance was continued by the same person who first erected it, although the premises claimed to be injured by the nuisance had been conveyed. We presume the latter was what was intended by the ruling, and that would include the former; and we think the ruling, in that view of it, correct.

In *Woodman* v. *Tufts*, 9 N. H. 91, after stating the doctrines applicable to notice, when the one who has erected the nuisance conveys it with the land on which it is located, it is said, " A similar reason for a request to abate a nuisance arises where the property affected by the nuisance has been aliened.  If the grantor acquiesced in the act affecting the property, or made no complaint, the natural inference would seem to be that the grantee willingly took the property as he found it, and it would be considered as an assent on his part, until request should be made that the nuisance be abated.  In *Penruddock's Case*, 5 Coke 100, it is said, " If the house affected by the nuisance be aliened, the alience, after request made to remove or abate the nuisance, may maintain an action for the nuisance."

But such is not the law.  The reasons there given for the position are unsatisfactory, and the authority which is cited in support of it does not sustain it.

The party who has erected a dam and flowed my land without right, is liable to me for the damages; and if I sell the land, and he continues to flow it by maintaining the same dam, he does not need any notice of the change of title or of possession.  He is presumed to know, and to intend the natural consequences of his acts, and is liable for the injury he does, which is no more or less to my grantee than it would have been to me, unless he wishes to use the land for some different purpose.  The party who originated the injury, and continues it, can not ask for any notice to make him aware of his liability.  He knows that as well as he did while I owned the land, or as he would if I had not sold it.  Suppose, as is assumed, that I had never objected, but had allowed the nuisance in silence for one year, or three years, I should then have the right to object, and to bring my suit for damages, and that without any notice ; and why should my grantee be required to give notice in such a case more than I ?  But suppose I had objected from the first, and had brought a suit and recovered judgment for damages, and then sold the land.  There the reason for the rule laid down in *Woodman* v. *Tufts* would be entirely removed, but the rule, as there stated, would remain, and must be applied alike, in all cases, whether with reason or against reason.

But again : Admitting the doctrine to be correct that a vendee of land, injured by a nuisance, must give notice to the person erecting and continuing the nuisance, before he can maintain his action, then, during the time when he is thus without remedy, the statute of limitations would not run against him, and such time must be deducted from the whole time, in ascertaining the twenty years of prescription ; and if he should never give the notice he would never be entitled to his remedy, and the defendant could never acquire the right to flow the land by prescription.  The defendants in this case would hardly assent to that doctrine probably.  But it may be said that the party injured should be required to give his notice in reasonable time, and that only such reasonable time should be deducted from the whole time in fixing the time of prescription.  But various difficulties might present themselves to any such holding, which we need not now stop to consider.  The

defendants would hardly be willing to adopt that doctrine, at least if making such a deduction was to defeat a prescriptive right which they would otherwise be able to establish; and with reason, because we think they might properly claim that if they had flowed the land now owned by the plaintiffs, just as they now do, for twenty years and more, before this suit was commenced openly, visibly, without interruption, and adversely to every one claiming the land during that time, the right had been gained.  Nor would it make any difference in regard to the user being adverse, whether the man who originally owned the land that was injured, had con-. tinued to own during all the twenty years, or whether the land had changed hands every year during that time.

No such objections arise to the notice to the vendee of the land on which the nuisance is located, because it is there held that the owner of the land injured has his remedy all the time against some one.   If he can not sue the vendee of the nuisance without notice, he can the vendor, even after he has aliened the nuisance; and, after notice to the vendee, he may sue either, at his election.

I find the precise expression which is used in *Woodman* v. *Tufts* as being from *Penruddock's Case*, in 12 Petersdorff's Abridgement, 798, 799, note, with a reference to the same authority, but the case itself authorizes no such conclusion.  *Penruddock's Case*, 5 Coke 101, was a *quod permittat prosternere*, between Clark, plaintiff, and Penruddock and wife, defendants.   The case was this : John Cock built a house on his land, so near the curtilage of Thomas Chichley that his house did· overhang the curtilage of said Chichley three feet.   Cock then conveyed his house to Penruddock and his wife, and Chichley, to whom the nuisance was done, conveyed his house to Clark, the plaintiff.   It was objected by the defendant, that if the tenant to whom the wrong is done, enfeoffs another, his feoffee shall never avoid this wrong, for he shall take the land in the same plight as it was given him.   Wherefore it was contended that the feoffee should not have the said *quod permittat*, to avoid the wrong and nuisance made in the time of his feoffor.

But it was resolved that the dropping of the water, in the time of the feoffee, is a new wrong, so that the permission of the wrong by the feoffor, or his feoffee, to continue, to the prejudice of another, shall be punished by the feoffee of the house to which the injury was done ; and if it be not reformed, after request made, the *quod permittat* lies against the feoffee, &c.   But without request made it doth not lie against the feoffee, but against him who did the wrong it lies without any request made, for the law doth not require any request to be made to him who doth the wrong himself.

So that *Penruddock's Case*, instead of being an authority that the feoffee of the house injured could not maintain the writ of *quod permittat* at all, without notice, is a direct authority that such feoffee may maintain the action against the party doing the original wrong, and continuing it, without any notice ; and that the notice in that case was required, not because the plaintiff was the feoffee of the premises injured, but because the defendant was the feoffee of the premises containing the nuisance.   This case is stated briefly by

*Richardson*, C. J., in *Plummer* v. *Harper*, 3 N. H. 91; and by *Savage*, C. J., much more fully, in *Blunt* v. *Aiken*, 15 Wend. 523; and again by *Jewett*, J., in *Waggoner* v. *Jermain*, 3 Denio 309; and in all the doctrine of that case is approved. I find the same doctrine held in *Westbourne* v. *Mordant*, Cro. Eliz. 191; in *Beswick* v. *Cunden Hill*, Cro. Eliz. 402; *Some* v. *Barwish*, Cro. Jac. 231, and in *Brent* v. *Haddon*, Cro. Jac. 555, where a request was made to the lessee of the party erecting the nuisance.

In *Curtice* v. *Thompson*, 19 N. H. 471, the true principle is stated, where it is said, in speaking of the defendants, "As the authors of the nuisance, then, they have no right to any notice. They are liable upon the evidence which charges them with having caused the nuisance; notice being required only to charge a purchaser by reason of having adopted it. So in *Johnson* v. *Lewis*, 13 Conn. 303, the plaintiff was the feoffee of land injured, and the defendant was feoffee of the land containing the nuisance, and held that notice was necessary before suit, not because of the plaintiff's position, but because the defendant was purchaser of the land containing the nuisance. And it is said that otherwise the purchaser of such property might be subjected to great injustice if he were made responsible for consequences of which he might be ignorant, and for damages which he never intended to occasion. *Branch* v. *Doane*, 17 Conn. 402, 418, is also a case in point. So in *Hatch* v. *Dwight*, 17 Mass. 289, it is held that the right of a mortgagee to commence an action in such a case exists as soon as he takes possession of the mortgaged premises.

The party obstructing a water-course, so that it overflows the plaintiff's land, is not exonerated by conveying the land to another, nor is he entitled to notice to abate before action brought. 1 Hill. on Torts 710; Angell on Water-courses, sec. 403; *Wasson* v. *Sanborn*, Rockingham Co., December term, 1861.

The other portion of these instructions, that the defendants were liable in nominal damages, if they had, by their dam and flashboards, raised the water on the plaintiffs' land, actually and perceptibly, higher than they had the right to do, is in accordance with numerous decisions in this State and elsewhere. *Snow* v. *Cowles*, 22 N. H. 296, 302; *Woodman* v. *Tufts*, 9 N. H. 91; *Bassett* v. *Salisbury Manf. Co.*, 28 N. H. 438; *Tillotson* v. *Smith*, 32 N. H. 90, 96, and cases cited; *Branche* v. *Doane*, 18 Conn. 233. But it becomes unnecessary here to express any opinion upon the question thus raised, or upon the authorities thus cited, as the jury gave damages in the sum of two hundred dollars, which is more than nominal, and shows that the jury found the plaintiffs' land had been actually, and substantially, and wrongfully damaged by the defendants. No state of facts arose to which the instructions could apply, and they therefore became immaterial.

. The same is true in relation to the instructions, which the court declined to give, in regard to the reasonable use of the stream by the defendants; for those instructions were sought and predicated upon the assumption that no actual damage was done. Upon the finding of the jury those instructions also became immaterial.

The act of the legislature, passed July 3, 1861, by its own limitations has no application to this suit. The other acts referred to authorize the purchase of lands about Amoskeag falls, and the erection of a dam there across the Merrimack river, with other works, buildings and machinery, for the purposes of carrying on the manufacturing business in various departments. But none of these acts in terms gave the company any right to take the lands of others for their use, nor do they provide for any compensation for lands so taken; and without the latter provision any authority to take lands, either express or implied, in their charter, or any act of the legislature, would be unconstitutional and void. But these acts simply give the company the right to build a dam and mills of various kinds for the company's own use. But an act authorizing one to build a dam on his own land upon a river which is a highway, merely protects him from an indictment for a nuisance in obstructing the river; but if in doing this he overflows his neighbor's land, he is liable to an action therefor. *Thatcher* v. *Dartmouth Bridge*, 18 Pick. 501; *Crittenden* v. *Wilson*, 5 Cow. 165; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162; Angell on Water-courses, sec. 476. The ruling on this point was correct. There must, therefore, be

*Judgment on the verdict.*